IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 15, 2008 Session

# IN RE B.D., R.M.T. & V.F.T.

**Appeal from the Juvenile Court for Dickson County
No. 05-07-069-CC A. Andrew Jackson, Judge**

_____

**No. M2008-01174-COA-R3-PT - Filed March 2, 2009**

_____


Mother and Father appeal the order of the Juvenile Court for Dickson County, Tennessee terminating their parental rights. Mother's termination was based on: noncompliance with the permanency plan; failure to visit; failure to establish a suitable home; and the persistence of conditions that prevent return of the children; and the children's best interests. Father's termination was based on noncompliance with the permanency plan and the children's best interests. Finding by clear and convincing evidence that grounds for termination exist and that termination is in the children's best interests, as modified, the judgment is affirmed.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part
and Reversed in Part**

WALTER C. KURTZ, SR. J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and RICHARD H. DINKINS, J., joined.

Hillary H. Duke, Dickson, Tennessee, for the appellant Regina C.

James L. Baum, Burns, Tennessee, for the appellant Nicholas T.

Robert E. Cooper, Jr., Attorney General and Reporter, and Dianne Stamey Dycus, Deputy Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Jack L. Garton, Dickson, Tennessee, Guardian ad Litem for B.D.

B. Kyle Sanders, Dickson, Tennessee, Guardian ad Litem for R.M.T. and V.F.T.

1

**OPINION**

On May 11, 2007, the Department of Children's Services [DCS] filed a petition seeking to terminate the parental rights of appellants ["Father"] and ["Mother"] to their two children, R.M.T., (d.o.b. 01-28-98) and V.R.T. (d.o.b. 09-21-01). DCS also sought termination of Mother's parental rights to her son B.D. (d.o.b. 03-23-95). The termination petition was filed 32 months after the children were taken into protective custody.

A bench trial was held before the juvenile court for Dickson County, Tennessee, the Honorable A. Andrew Jackson presiding on November 16, 2007, February 29, 2008, and April 14, 2008[1]. After the testimony of a number of mental health professionals, DCS workers including the case manager, and both appellants, the juvenile court terminated their parental rights. The court found that neither parent had substantially complied with permanency plans. Furthermore, he found that Mother had also abandoned her children by failure to visit and by failure to provide a suitable home, and that persistent conditions existed. As to both parents he found that termination was in the best interests of the children. On May 12, 2008, the court entered an 11-page Order Terminating Parental Rights and Final Decree of Guardianship, thereby terminating the rights of Mother and Father. Father filed a notice of appeal on May 14, 2008, and Mother filed on May 22, 2008.

## I. Relevant Facts

This case involves a family broken apart by the oldest minor child molesting his younger half-siblings and also by parents who, even after the assistance of the state, seem incapable of dealing with the aftermath of child sexual abuse and providing stability.

Mother's son was by a prior relationship, while the two younger daughters were Mother's by her marriage to Father[2]. Mother and Father had been separated for four months at the time of the removal. They have since divorced, and Mother had remarried by the time of the termination hearing.

DCS became involved with this family after receiving a referral on September 14, 2004, alleging that B.D. was inappropriately touching his half-sisters R.M.T. and V.R.T. DCS had Mother sign a safety plan which required her to supervise her son B.D. when he was playing with his sisters. On September 15, 2004, DCS received an additional referral that B.D. was acting in sexually inappropriate ways with children in the neighborhood. On September 16, 2004, mother contacted DCS to say that her son was acting out sexually and that she was unable to properly supervise him. DCS then filed a petition in juvenile court for temporary custody of all three children and removed

_____

[1] The record does not disclose why the hearing took six months to complete when only three court dates were involved.

[2] The parental rights of son B.D.'s father were terminated by this action, but he has not appealed the termination of his rights.

2

the children from Mother's home.

At the time of the removal, Father and Mother had been separated for four months. They later divorced. The divorce court gave Father custody of the two girls (subject to the juvenile court orders), and Mother was given visitation rights to them and custody of her son B.D. Mother subsequently remarried in March 2006.

According to DCS and the juvenile court, during the 2004 investigation, the mother first denied and then later admitted firsthand knowledge of B.D.'s behavior. The court found that Mother had instructed the children to lie to DCS and the police about what had been going on, even saying to B.D. at the initial child and family team meeting, "Look what happens when you tell the truth." As a result, the juvenile court dissolved the safety plan and granted DCS custody of the children, finding that DCS could not remedy the situation with the children at home. At a March 23, 2005, adjudicatory hearing the court found the children to be dependant and neglected. The allegations of sexual abuse against B.D. were determined to be true; B.D. admitted doing "nasty things" to his sisters. Following removal from his mother's home, B.D. claimed that Father had physically and sexually abused him. Although these claims were investigated and found to be unsubstantiated, B.D. was given a psychosexual evaluation that found that he was traumatized, had trouble distinguishing between sex and violence, and, in general, needed a lot of help and treatment. After a recommendation that B.D. not be placed in a home with his sisters, B.D. was placed at Reflections, an adolescent sex offenders treatment program, where he has been making progress with his special needs treatment.[3]

The two sisters, R.M.T. and V.F.T., as victims of sexual abuse, also required counseling and treatment. They both received services from the Rape and Sexual Abuse Center (RASAC) and the Child Advocacy Center. At the time of the trial, older sister R.M.T. had been able to work through many of the issues associated with sexual abuse. Younger sister V.F.T.'s behaviors initially improved but then regressed, ultimately to the point where the foster mother could no longer continue to provide a home to these girls.[4]

Based on the reasons for the removal of the children and their special needs related to the sexual abuse, on October 15, 2004, DCS prepared permanency plans for both Mother (as to all three of her children: B.D., R.M.T., and V.R.T.) and Father (as to his two girls: R.M.T. and V.R.T.). A main purpose of these plans was to assist Mother and Father in learning how to effectively parent these children with special needs due to sexual abuse. The plans listed a number of required tasks

---

[3] B.D. alleged that Father had sexually and physically abused both him and his sisters. DCS investigated on two separate occasions but found all claims to be unsubstantiated. This allegation was the basis for the state's requiring Father to participate in sex offender treatment and counseling.

[4] The foster mother and counselor both testified at trial that V.F.T. exhibited signs of emotional disturbance, such as frequent temper tantrums, nightmares, and wetting her pants at home and at day care.

and actions that Mother and Father needed to satisfy before family reunification could be considered and the children safely returned home. The plans gave Mother and Father until April 12, 2005, to satisfy those requirements.

The plans required Mother to do the following: to provide proper supervision for her children at all times; to attend and participate in all sessions of RASAC counseling; to inform the case manager of all changes in address and telephone number; to attend and participate in all sessions of individual counseling; to inform the case manager of the therapist's name; to sign a release of information from the therapist so the case manager could monitor progress.

The plans required Father to do the following: to attend and participate in all sessions of individual counseling; to inform the case manager of the therapist's name; and to sign a release of information from the therapist so the case manager could monitor progress.

Mother signed the plan on October 15, 2004, and Father signed the plan on December 2, 2004.

The permanency plans were revised on October 21, 2005. Father's revised plan reiterated the original requirements and added or changed the following requirements: to obtain a psychosexual evaluation and follow the recommendations; to schedule an appointment within two days of the staffing; to inform the case manager of the time, date and place of the psychosexual evaluation; to inform the case manager of any problems he encountered scheduling the appointment or finding a service provider; and to demonstrate appropriate parenting skills and age-appropriate discipline. This revised plan gave Father until December 21, 2006 to satisfy the requirements.

Father signed the plan on October 21, 2005. Mother signed the revised plan, which included the same original requirements, on October 27, 2005.

The permanency plans were again revised on May 16, 2006. Mother's plan reiterated the existing requirements and included additions and changes necessitated by Mother's marriage to Husband. Her new Husband was required to do the following: to schedule a clinical assessment that included a parenting assessment; to inform the case manager of the time, date and place of the appointment; to inform the case manager of any scheduling difficulties as assistance could be provided; to sign a release of information so the case manager could communicate with the therapist on his progress; and to provide adequate supervision for the children at all times. Husband was also required to schedule an alcohol and drug assessment; inform the case manager of the date, time and location of this assessment; and inform the case manager if he needed any assistance with scheduling or funding this assessment. Husband was further required to follow the recommendations resulting from this assessment. Additionally, Mother and Husband were required to follow the RASAC and Centerstone safety plans that were to be in effect when the children returned home.

The revised plans gave Mother and Husband until October 16, 2006, to satisfy the requirements, and they signed the plans on May 16, 2006.

4

Once again, the permanency plans were revised on January 25, 2007, reiterating the existing requirements for Father, Mother and Husband. Father, however, was additionally required: to follow the recommendations of the psychosexual evaluation; and to inform the case manager of any problems or concerns with the in-home service provider or in scheduling appointments. These plans gave Father, Mother and Husband until May 30, 2007 to satisfy the requirements. On January 25, 2007, Father by signature, "acknowledged that he h[ad] received a copy of Criteria and Procedures for Termination of Parental Rights and h[ad] been given an explanation of its contents"; Mother made no such acknowledgment. Neither Mother nor Father signed the permanency plan, and both indicated that they did not agree with it. Mother wanted to review the plan with her attorney before she signed. Father wrote, "I do not agree with filing a TPR due to the constant and consistent gaps in helping me to meet goals on permanency plan."

The January 25, 2007, plan set a permanency goal of adoption for the children, stating that "[d]ue to the length of time the children have been in custody and persistence of conditions the Department will file a TPR petition," so the children "will have a permanent stable home and family." This new goal further stated, "When deemed appropriate, the Department will begin searching for a permanent, stable home for [the children.]" . . . and they "will have memories of [their] family by keeping a life book." The expected achievement date for this new goal was January 25, 2008, with the responsible persons including DCS, adoption specialist and foster parent.

Mother remarried in March 2006 to ["Husband"] which created instant problems. Mother admitted at trial that she had a history of domestic disputes with Husband prior to their marriage. Some of these disputes resulted in police involvement and criminal charges being filed. Mother denied that these were serious incidents. She explained that they resulted from Husband's drug use which she claimed had been resolved. Mother stated that she had known Husband since their schooldays, and she did not see a problem in marrying someone with whom she had a history of domestic violence, even though B.D., as a sex offender, had trouble distinguishing between sex and violence.

On May 11, 2007,[5] DCS filed a petition to terminate the parental rights of Mother and Father. Against Mother, DCS alleged four grounds for termination: "Abandonment - Failure to Visit"; "Abandonment - Failure to Provide Suitable Home"; "Substantial Noncompliance with Permanency Plan;"and "Persistent Conditions."

Against Father, DCS alleged the termination ground "Substantial Noncompliance with Permanency Plan." In the July 10, 2007, amended petition DCS alleged a second ground, "Severe Child Abuse."

---

[5] According to DCS's petition Mother's last visit with the children was February 9, 2007. The foster mother testified at trial that Mother also visited in late February or early March. Their first petition to terminate was filed on May 11, 2007, which was not four months since Mother's last visitation, as required by Tenn. Code Ann. § 36-1-102(1)(A)(I). The amended petition filed on July 10, 2007, met this time requirement.

5

DCS also alleged that it was in the children's best interests to terminate both Mother's and Father's parental rights.

The three-day trial was held over the course of five months on November 16, 2007, February 29, 2008, and April 14, 2008. Both Mother and Father were represented by counsel, as was DCS. B.D's guardian ad litem and R.M.T. and V.R.T.'s shared guardian ad litem also participated. The juvenile court heard testimony from Mother, Father, B.D., the foster mother, the DCS case manager, investigator, and several caseworkers and treatment providers assigned to Mother, Father, R.M.T. and V.R.T., and B.D.

B.D.'s guardian ad litem told the Court that B.D. has always been adamant about wanting to return to his Mother's home, and he opined that Mother had no knowledge of or involvement in his sexual abuse. Thus, the guardian ad litem "would like to see [B.D.] go home." He also pointed out that if there is no termination, then "that doesn't mean he's going back home to his mother today . . . he still has a little ways to go."

The guardian ad litem for R.M.T. and V.R.T., supported termination of Father's rights because Father never truly acknowledged their special needs and did not accept DCS's services, so his home is not appropriate. He also supported termination of Mother's rights because she was presently without a home.[6] Mr. Sanders further stated that the children need stability and that if B.D. is placed back with Mother, then the girls cannot live there. The girls, like B.D., had repeatedly expressed that they desired to return to life with Mother and Father and said they loved them.

The juvenile court judge ruled orally that the parental rights of both Mother and Father should be terminated. As to Father, the court stated that there was "no question there's a substantial noncompliance with the permanency plan." The court found the following: that DCS had provided two month's rent so that Father could meet his medical insurance deductible, but Father cancelled the insurance anyway; his psychosexual evaluation resulted in a defensive measure so high that the results were inconclusive; he had not received a parenting assessment; and he had not received individual counseling. The court found incredulous the fact that Father testified that he learned about parenting his children and their special needs by talking to the foster parents and the people who transported the children. The juvenile court did not, however, find that Father had sexually abused B.D.

As to Mother, the court found that persistent conditions still existed because Mother was not able to deal with the children's problems. With regard to compliance and the best interest of the children, the court further stated:

> [Mother's] jumped through all the hoops, but what's she
> learned? What's she able to provide? What can she do for these

_____

[6] Mother testified on February 29, 2008, that she had been living with Husband in her grandmother's three-bedroom house near Chicago. However, the case manager testified on April 14, 2008, that Mother admitted she was living with a friend in a hotel in Dickson. Mother did not testify again on April 14, 2008.

children? Can she, in fact, properly parent these children?

. . . I have to agree with the [State], it's not so much that someone complies with the permanency plan. It's whether or not, as result of their compliance with the permanency plan, they're able to do the things that they've learned in the plan. That they can provide for the child appropriately.

And I think that that is exactly what compliance with the permanency plan is. Here are the things you need to do, and after you do these things, here's the desired outcome. . . [I]s it in the best interest of the child to go home, or the children to go home? And I don't see it; nor do I see that the conditions are going to remedy themselves anytime soon, particularly with Mother, who is currently homeless. I don't see how that could even begin to cure itself anytime soon.

The court did not in his oral ruling make mention of any abandonment by Mother, either by failure to visit or by failure to provide a suitable home.

In a subsequent written order, the juvenile court found by clear and convincing evidence that the following grounds existed to terminate Mother's parental rights: abandonment by failure to visit and by failure to provide a suitable home; persistence of conditions; and failure to comply with the permanency plan's obligations (substantial noncompliance), which were reasonably related to the plan's goals, and also that DCS had made reasonable efforts to assist Mother in satisfying these requirements. The written order also contains the trial court's conclusion that termination was in the children's best interests. Accordingly, the court terminated Mother's parental rights as to all three children.

As to Father's rights, the trial court's written order included its finding, by clear and convincing evidence, that Father had also failed to comply with the rights and responsibilities of the permanency plan, which were reasonably related to DCS's goals, and DCS had made reasonable efforts to assist him. The trial court concluded in the order that termination of Father's parental rights was also in the best interests of the two girls and so terminated them.

## II. Issues on Appeal

Mother raises five issues on appeal:

1.    Whether there was sufficient evidence that appellant abandoned the minor children pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(i).

2.    Whether there was sufficient evidence that appellant abandoned the minor children pursuant to Tenn. Code Ann. § 36-1-102(1)(A)(ii).

3.    Whether there was sufficient evidence of appellant's substantial noncompliance with

the stated goals of the permanency plan.

4.  Whether there was sufficient evidence that the conditions which led to removal persist.

5.  Whether there was sufficient evidence that termination of the appellant's parental rights were in the best interest of the minor children.

Father raises three issues on appeal:

1.  Whether appellant was denied a fair trial where the trial court applied the wrong standard of review and arbitrarily admitted improper evidence.

2.  Whether it is in the best interest of [his two daughters] that their father's parental rights be terminated.

3.  Whether there is clear and convincing evidence that appellant failed to substantially comply with the statement of responsibilities.

And the state defined the issues on appeal as follows:

1.  Whether the juvenile court properly terminated [Mother's] parental rights on two separate abandonment grounds: engaging in only token visitation and failing to meet the department's reasonable efforts to help her provide a suitable home for her children in the four months following her children's removal.

2.  Whether the juvenile court properly terminated [Mother's] parental rights for her failure to remedy persistent conditions that prevented her reunification with her children at an early date.

3.  Whether the juvenile court properly terminated both [Mother and Father's] parental rights when they did not substantially comply with the requirements of their permanency plans.

4.  Whether the juvenile court properly determined that termination of both [Mother and Father's] parental rights was in the children's best interest.

### III. Standard of Review

The standard of review as well as the constitutional and statutory overview of a termination case have been discussed in a number of cases. The rules governing our review are well set out by Judge (now Justice) Koch in *In re M.J.B.*, 140 S.W.3d 643, 652-654 (Tenn. App. 2004):

8

Termination proceedings in Tennessee are governed by statute. Parties who have standing to seek the termination of a biological parent's parental rights must prove two things. First, they must prove the existence of at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1); *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d at 838. Second they must prove that terminating the parent's parental rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(2) (citations omitted).

No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever. Tenn. Code Ann. § 36-1-113(*l*)(1); *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 565, 136 L.Ed.2d 473 (1996)(citations omitted). Because the stakes are so profoundly high, Tenn. Code Ann. § 36-1-113(c)(1) requires persons seeking to terminate a biological parent's parental rights to prove the statutory grounds for termination by clear and convincing evidence. This heightened burden of proof minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.,* 980 S.W.2d at 622. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable (citations omitted), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2002). It produces in the fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d at 733; *In re C.W.W.*, 37 S.W.3d at 474.

Because of the gravity of their consequences, proceedings to terminate parental rights require individualized decision making. *In re Swanson*, 2 S.W.3d at 188.

. . . .

Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. Pro. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. Civ. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine

whether the facts, either as found by the trial court or as supported by the preponderance of the evidence of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. (citations omitted).

*In re M.J.B.* at 652-654; *See also In re Georgianna*, 205 S.W.3d 508, 515-516 (Tenn. Ct. App. 2006).

## IV.  Discussion

### A.  Grounds for Termination of Mother's Parental Rights

**Substantial Noncompliance with Permanency Plan Obligations**

A trial court may use as a ground for termination a finding that:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4.

Tenn. Code Ann. § 36-1-113(g)(2).  Additionally, DCS must prove and a trial court must first find that the requirements of a permanency plan are "reasonably related to remedying the conditions which necessitate foster care placement," *Id.* at § 37-2-403(a)(2)(c) . The court must also find that the parent's noncompliance was substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d 539, 548-549 (Tenn. 2002); *State v. T.M.B.K.,* 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006). Trivial, minor, or technical deviations from a permanency plans's requirements will not be deemed to amount to substantial noncompliance.  *In re Valentine*, 79 S.W.3d at 548.

In the case now before us the juvenile court, in concluding that Mother had "not substantially complied with the responsibilities and requirements set out for her in the permanency plan," made the following findings:

> **While [Mother] has completed many of the tasks on the Permanency Plans, she has not been able to demonstrate that she has reached the ultimate goal of being able to appropriately parent her children**.  It was discovered that [Mother] and [Husband] had been involved in several serious domestic disputes and were charged with assault, domestic assault, intimidation, false information and contempt of court.  Some of these charges have resulted in convictions.  (emphasis added).

The court's written termination order further concludes that "[Mother] failed to comply with the tasks in the 2004, 2005, 2006 and 2007 permanency plans, requirements which are reasonable and related to remedying the conditions which necessitate[d] foster care placement."  The order,

10

however, makes no further mention of specifically how these requirements are reasonably related to a remedying the conditions that brought about removal.[7] Our de novo review of the record shows that Mother's permanency plan's requirements are reasonably-related to the two stated goals of family reunification and Mother being able to parent all three special needs children. And we also find that DCS did in fact make reasonable efforts to assist Mother in reaching the goals, particularly by providing parenting classes, RASAC and individual counseling and by supervising visits with the children.[8]

What is also shown from the record, however, is that the juvenile court improperly based its finding of substantial noncompliance upon the fact that DCS's outcomes and goals were not reached rather than Mother's efforts to reach them. This Court has made clear that outcome achievement is not the measure of compliance:

> The foregoing evidence clearly indicates that Mother and Father failed to achieve the "desired outcome[s]" of the permanency plans, i.e., they failed to demonstrate the ability to recognize and meet the child's physical and emotional needs, and they failed to demonstrate that they had the developmental and emotional capacity to properly care for the child. However, *Tenn. Code Ann.* § 36-1-113(g)(2) does not require substantial compliance with a permanency plan's "desired outcome[s]," rather it requires substantial compliance with a plan's statement of responsibilities, i.e., the actions required to be taken by the parent or parents. Mother and Father obtained the required parenting and psychological assessments [and complied with other requirements] . . . . [W]e conclude that there is an absence of evidence showing that Mother and Father failed to follow specific recommendations of the assessments/evaluations or that they failed to comply with other specific statements of responsibility. Accordingly, we cannot say that there is clear and convincing evidence of substantial noncompliance with the permanency plans. Thus, we find that the evidence preponderates against the trial court's finding with respect to this ground for termination.

*Tennessee Dept. Children's Services v. P.M.T. et al.*, 2006 WL 2644373, at *8 (Tenn. Ct. App. 2006). *See also In re J.H.S.*, 2007 WL 1341771, at *8 (Tenn. Ct. App. 2007) (Court reversed finding

---

[7] "Because the trial court made no finding regarding the reasonableness of [the mother's] responsibilities under the permanency plans, our review of this issue is de novo." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002).

[8] "While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)(*citing In re C.M.M.,* 2004 WL 438326, at *7 (Tenn. Ct. App. March 9, 2004). *See* Tenn. Code Ann. § 37-1-166 (b)(g) (DCS 's obligation to make reasonable efforts to reunite the family).

11

of substantial noncompliance where "the only permanency plan requirement where Mother fell short was her inability to consistently demonstrate proper parenting skills"). Thus, even if Mother did not learn how to effectively parent the children, under *P.M.T.*, this is not a dispositive factor in our determination of termination based on substantial noncompliance.

Interestingly, the DCS case manager defined substantial noncompliance as "when a parent is informed of the tasks on the permanency plan and they do not comply with those tasks . . . over a certain period of time." Regarding Mother's permanency plan, the case manager also later admitted that "[s]he's complied with it."

We conclude that the evidence preponderates against the juvenile court's finding that there was substantial noncompliance with the permanency plan by Mother. Accordingly, we reverse as to this issue.

### Abandonment by Willful Failure to Visit

A trial court may use as a ground for termination a finding that "abandonment by the parent or guardian, as defined by [Tenn. Code Ann.] § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). "Abandonment" is defined at Tenn. Code Ann. § 36-1-102(1)(A)(i) as :

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) . . . have willfully failed to visit . . .

And " 'willfully failed to visit' means the willful failure, for a period of four (4) months to visit or engage in more than token visitation." *Id.* at § 36-1-102(1)(E).

The juvenile court found that Mother had willfully failed to visit her children or had make only token visits, and it concluded that this was a ground for terminating Mother's parental rights. In so doing, the court stated in its written order:

> The Court concludes that clear and convincing evidence supports findings that [Mother] committed abandonment under § 36-1-102(1)(A)(i). It is undisputed that [Mother] has abandoned the

12

children because she willfully has not visited or has made only token visits in the four (4) months right before the filing of this Petition. In the past three (3) months, [Mother] has not visited the children. The last visit was on February 9, 2007. [Mother] was not in jail or incapacitated in any way in the past four (4) months. [Mother] knew that the children were in DCS custody because she has participated in DCS staffings, court [proceedings] and had visited the children regularly. DCS has tried to contact [Mother] to set up a visit by offering to pay for transportation and a hotel room to Dickson, Tennessee as she has moved to Illinois. Mother knew the consequences of her failure to visit the children regularly because she signed a statement verifying that she received an explanation of those consequences on October 15, 2004, October 21, 2005, May 16, 2006, and although she refused to sign the statement on January 25, 2007, the consequences were explained to her on that date.

A review of the record shows that Mother's visits, while less than perfectly regular, do show that she made efforts to maintain a relationship with her children and have meaningful visits with them. Even when unable to visit, Mother's actions fall short of "willful" abandonment.

Mother visited the children on January 2, 2007, January 27, 2007, and February 9, 2007. The foster mother testified that Mother also visited with the girls in late February or early March 2007. Mother moved to be near family support in Illinois in late February 2007, which made visitations difficult. Nonetheless, despite transportation and financial issues, Mother visited with the minor children on July 27, 2007, March 25, 2008 and March 26, 2008. Mother scheduled a visitation for the weekend of April 12, 2008, but the foster parents failed to deliver the girls for visitation.

Mother made these 2007 visits without assistance to and from Illinois. Even though the caseworker knew that Mother did not have transportation and could not financially afford to travel to Tennessee, the state only began to offer transportation and lodging to Mother after the petition for termination was filed. Once help was offered, Mother's visitations resumed. Furthermore, as the case manager testified, Mother stayed in regular contact with the children by telephone and letters, as was identified in the visitation section of the permanency plan.

13

A mother's irregular and inconsistent visitation was at issue in *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002), where the state alleged that such constituted "substantial noncompliance" with the parenting plan. *Id.* at 549. The *Valentine* Court did not find paramount the fact that the parent had a less than perfect visitation record but instead ruled this to be "partial compliance," and not grounds for termination. This same reasoning readily applies to a determination of abandonment.

This Court now similarly finds that Mother's less than perfect visitation record is not proof of abandonment by clear and convincing evidence. The evidence preponderates against the juvenile court's finding that Mother's abandonment based on non-visitation constitutes grounds for termination. Accordingly, we reverse as to this issue.

### Abandonment by Failure to Provide Suitable Housing

Under Tenn. Code Ann. § 36-1-113(g)(1), a trial court may also use as a ground for termination a finding that abandonment has occurred by the parent's failure to provide a suitable home:

> (ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date;

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

In addition to "willful failure to visit," the juvenile court concluded that Mother had also abandoned her children by failing to provide a suitable home. The court explained its findings of fact as to this additional ground for termination of Mother's parental rights stating the following:

> In the 42 months after the removal, the Department has made reasonable efforts to assist [Mother] to establish a suitable home for the children by providing services including counseling at the Rape and Sexual Abuse Center (RASAC), individual and family counseling to address the issues that arise from her children having been sexually

14

abused, discipline, communicating and caring for a sexually reactive child, and proper supervision, and therapeutic visitation to assist [Mother] in implementing some of the parenting skills she was supposed to have learned.

[Mother] has made no reasonable efforts to provide a suitable home. Instead [Mother] continues to ask the children to lie, recently telling them that sometimes you have to lie. She and [Husband] have been involved in several domestic disputes to which the police have been called. They have received charges resulting from these disputes. **[Mother] is presently homeless.**

[Mother's] failure to make even minimal efforts to improve her home and or personal condition demonstrates a lack of concern for the children to such a degree that it appears unlikely that she will be able to provide a suitable home for the children at an early date. (emphasis added).

We agree with the juvenile court's ultimate conclusion here, but we do acknowledge that after removal of the children Mother earlier did make at least minimal efforts in an attempt to provide a suitable home. For example, by December 2005, Mother had obtained employment and leased a three bedroom house; however, before DCS could conduct a home visit, she left the property after a dispute with the landlord.

Again in February 2007, according to Mother's testimony on February 29, 2008, she moved to Illinois to be near family and receive mental health treatment. She and Husband lived in her grandmother's three-bedroom house, and Husband, employed at a steel plant, earned a salary sufficient to cover food, utilities and other household expenses. DCS did not conduct a home visit of the Illinois residence either.

At the next and final trial date held on April 14, 2008, it was revealed that Mother was now presently homeless. The case manager, while being questioned by the girls' guardian ad litem, testified as to Mother's present home conditions:

GAL: Have you communicated with [Mother] recently regarding her living situation?

CM: Yes.

GAL: When was that communication?

CM: Well, actually, I've talked to her several times. I know initially she was living with her mother while the home, her grandmother's home, that she would be renting from her parents was under rehab. So I knew that. She was supposed to keep me updated on when they were moving into that

15

home. And then recently, she called me on March 9th, on Tuesday - - I mean, February - - no. Just this past Tuesday, April 9th, I'm sorry. And she had explained to me - - she left a message on my cell phone stating that she was - - it was an emergency. She was in crisis situation. I called her back and she had stated that they're back - - she and [Husband] are back in Tennessee. And the crisis was that she was homeless and needed a place.

GAL: When was that communication?

CM: April the 9th.

GAL: Of 2008?

CM: Yes.

GAL: Okay. And do you have any idea where she's living right now?

CM: Right now, she's staying with a friend, or - - and then she had a motel. We got her a motel for this weekend.

GAL: What other assistance did the Department give her to get her here to court today?

CM: Today?

GAL: Yes.

CM: We put gas in her - - the vehicle on Friday to make sure she had gas to get here today.

GAL: Okay. And is that something that the Department normally does, or does it need to be requested before you all do that?

CM: Requested.

GAL: And who requested gas to get to court today?

CM: [Mother]. . .stated that - - she called me on Friday morning, letting me know that she did not have gas to get to court today, and I assisted her with putting gas in the car.

GAL: Do you know who the friend is that she's living with?

CM: I do not.

GAL: Is it in Tennessee?

CM: Yes. In Dickson is where she had stated.

We believe that Mother's past efforts cannot compensate for her present homelessness and her continuing in a relationship with great potential for continued domestic violence. In a similar case, *In re JQW and LKW*, 2008 WL 2894824, at *3 (Tenn. Ct. App. July 23, 2008), this Court affirmed termination of parental rights, agreeing with the trial court that "although Mother initially made some efforts to ameliorate the conditions leading to the children's removal, Mother remained unable to provide a suitable home . . . [n]ow the parents have no known home at all. The children still do not have a place to live with the parents that is safe and suitable."

16

Likewise, B.D., R.M.T., and V.F.T. do not have a safe and suitable place to live with their Mother. This Court finds by clear and convincing evidence that Mother has failed to provide a suitable home and that the evidence does not preponderate against the juvenile court's findings. We affirm as to this ground for terminating Mother's parental rights.

**Persistence of Conditions**

A trial court may use as a ground for termination a finding that:

> (3)(A) The child has been removed from the home of the parent or guardian by order of the court for a period of six (6) months and;
>
> (i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A)(i-iii). In order to terminate parental rights based upon this ground, the party seeking termination must prove the existence of each of these factors by clear and convincing evidence. *See In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002).

The juvenile court, in its written order, determined that the above statutory requirements for this termination ground had been met. The court acknowledged that "DCS removed the children from the home because there had been referrals made about B.D.'s sexually inappropriate behavior with some children in the neighborhood" and with his sisters, and the children had been removed for 42 months. The juvenile court also found that "it was later learned that Mother had instructed the children to lie to DCS and the police about what had been going on." The court then concluded:

> . . . Mother at first denied any knowledge of B.D. being sexually inappropriate with his sisters, but later admitted that she did have first hand knowledge of this behavior. It was later learned that **Mother had instructed the children to lie to DCS and the police about what had been going on.** At the initial Child & Family Team Meeting Mother said to B.D., "Look what happens when you tell the truth."

17

The conditions that led to the removal still persist: [Mother] is still asking the children to lie. For instance, after [Mother] was given unsupervised visits she was ordered not to let [Husband], her then paramour and now husband, be at the visits. **She did allow [Husband] to attend the visits and asked [the girls] to lie about that**. [Mother] has had parenting classes, completed a course for parents of sexually abused children at the Rape and Sexual Abuse Center, and been through almost two (2) years of counseling and therapeutic visitation through Kids 1ˢᵗ and she still sees no harm in asking her children to lie. [Mother] told her children that "sometimes you have to lie." **[Mother] and her new husband have been consistently involved with law enforcement due to domestic violence. Other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the children.**

**There is little chance that those conditions will be remedied soon so that the children can be returned safely to the home** because, for 42 months, DCS made the following reasonable efforts to help [Mother] remedy them, to no avail: DCS set up counseling for [Mother] at the Rape and Sexual Abuse Center (RASAC), DCS set up individual and family counseling to address the issues that arise from her children having been sexually abused, discipline, communicating and caring for a sexually reactive child, and proper supervision. There has also been a Safety Plan developed for [Mother] if the children were to come home. DCS has also provided [Mother] with therapeutic visitation services in order to assist her in parenting her children. Even after all of the services **[Mother] recently promised the girls that they would be coming home soon to live with her and her new husband.** (emphasis added).

The juvenile court further concluded, "Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home."

In defining persistent conditions both DCS and the juvenile court relied heavily on statements concerning [Mother] telling the children to lie. As argued in her brief, Mother explains that the conclusion that she asked the children to lie was made by the investigator early in the case and was not substantiated during the trial, nor were the allegations that Mother told the children to lie about visiting with Husband. Mother explained at trial that the minor children did not visit with him, but rather they may have seen Husband from a distance in a parked car when Mother went to his work to get money.

Whether or not Mother lied and to what extent, if any, is a decision that this Court believes

was best made by the juvenile court, who, by observing first-hand Mother and the State's witnesses, was in a better position to determine credibility. Our review of the record shows that the evidence does not preponderate against the finding of Mother's continued lying as a persistent condition.

This Court, however, finds that an even more alarming condition persists: the violence between Mother and Husband "which in all reasonable probability would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i). Clear and convincing proof of this came from Mother's direct examination by the state at trial:

> I married [Husband] March 3 of '06. The first we got into an argument - - and I didn't know in the town of Dickson you couldn't argue in the town, so he got arrested for that. But it wasn't by me calling the cops or anything. The second time - - we had separated 'cause all this, we just couldn't deal with it, you know. I guess - - so we started going our separate ways, and he went into drugs. And he went to the police station, and he lied about me doing something to him . . . before I knew it, I'm at work, and I get arrested for something I was accused of doing that I had no - - I didn't even do nothing to him . . . . Well, he wasn't in his right state of mind. I mean, he was on drugs, and he cleared himself up. He's not on drugs anymore, and - - before we got married. And, you know, we put our differences to a side and stayed together because I love him.

And during redirect, the state elicited the following testimony from Mother:

> State: On the domestic violence on the times the police were called, there was one time when you were hiding [Husband], correct?
>
> State: The police came to your house looking for [Husband]. Do you recall that?
>
> Mother: I don't remember.
>
> State: You don't remember that?
>
> Mother: No.
>
> State: Okay. Do you remember Husband filing a report that said that you jumped on top of him and hit him with a vacuum cleaner.
>
> Mother: Yeah. That's the part where he had went to - - went to the police station and lied to them, 'cause he wasn't in his right state of mind.
>
> State: The - - and you say, there were just two times you were arrested:
>
> Mother: No, I was only arrested one time.
>
> State: You were only arrested one time?
>
> Mother: Yeah.
>
> State: [Husband] was arrested how many times?

19

> Mother: Once I recall. But the first time when they had came to the house, I told them that he can - - that they said that I wanted a restraining order against him. I'm like, "No, 'cause he's my boyfriend. You know, there's no need for that."
>
> State: So there was a restraining order?
>
> Mother: Yeah.
>
> State: And then he got arrested for being with you because he violated that restraining order?
>
> Mother: Yeah. And we - - I didn't know about that.

While not the reason for the children's removal from the home, this pattern of domestic violence and possible drug use around the children would subject them to further abuse and neglect. With Mother and Husband still together, as was the case at the April 14, 2008, trial, and with several years together during which time they chose not to try to end this abusive behavior, this Court finds "there is little likelihood that these conditions will be remedied at an early date so the child[ren] can be returned . . . . " Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Furthermore, even if in her homeless condition Mother had a house, it would be one of potential violence and abuse - certainly neither stable nor safe. Thus, this Court finds by clear and convincing evidence that the continuation of the relationship between Mother and her children "greatly diminishes the child's chances of early integration into a stable and permanent home." *Id.* at § 36-1-113(g)(A)(iii).

The court further observed that mother is intellectually and emotionally ill-equipped to deal with the miriad of problems facing these three children. She is unable to understand the special needs and/or care needed by children who have been either sexually abused or a child who has been an abuser. She would be unable to provide the care needed by these children. This observation not only relates to the persistence of conditions grounds but also to the subsequent best interest analysis.

The evidence does not preponderate against the juvenile court's findings of persistent conditions as a ground for termination of Mother's parental rights.

While we have reversed as to two of the four grounds, termination of Mother's parental rights is still affirmed, as the appellee has sustained two of the grounds as set forth above. *In re C.W.W.*, 37 S.W.3d 467, 473-474 (Tenn. Ct. App. 2000) (the existence of any one of the statutory bases will support a termination of parental rights).

## B. Grounds for Terminating Father's Parental Rights

### Substantial Noncompliance with Permanency Plan Obligations

In concluding that Father had not substantially complied with his permanency plan, the juvenile court made the following findings:

> Father has not completed any tasks on the Permanency Plans. Father still has failed to show interest in dealing with his children's sexual

20

abuse issues or shown much interest in their lives at all . . . DCS has contracted with Kids 1st to provide therapeutic visitation to Father in order to assist him with parenting beginning in September 2005. Father has been uncooperative with DCS. He was not cooperative during the Psychosexual Evaluation, he has not been responsive to the counseling to address the sexual abuse of his children by [B.D]., he has not had a parenting assessment . . . the reports from the Kids 1st therapist who is supervising his visits with the children indicate that Father does not possess many positive parenting skills.

The court's written termination order further concludes that "[Father] failed to comply with the tasks in the 2004, 2005, 2006 and 2007 Permanency Plans, requirements which are reasonable and related to remedying the conditions which necessitate[d] foster care placement." Our de novo review of the record shows that Father's permanency plan requirements are reasonably-related to the two stated goals of family reunification and his being able to parent his two girls, who have special needs resulting from the sexual abuse by their half-brother B.D.

We find, however, that Father's requirements to obtain a psycho-sexual evaluation and counseling are not reasonably-related to remedying the condition necessitating foster care placement, nor are they relevant to our determination here. As noted, on two separate occasions the State investigated allegations that Father had sexually abused B.D. and/or R.M.T. and/or V.F.T. and found these allegations to be unsubstantiated. Thus, the permanency plans should not have required any tasks relating to unfounded sexual abuse by Father. Our review here of this issue will not take into consideration any lack of compliance by Father with these requirements.

We further find that DCS did in fact make reasonable efforts to assist Father in reaching his goals, particularly by providing parenting classes, RASAC and individual counseling, and by supervising visits with the children. DCS also provided $1,000 financial assistance to Father for rent and utilities so he could afford a health insurance deductible in the same amount, so his insurance would cover counseling and treatment costs.

Father, citing to *Tennessee Dept. Children's Services v. P.M.T., et al.*, 2006 WL 2644373, at *8 (Tenn. Ct. App. 2006), raises as a separate issue on appeal that the trial court applied the wrong standard of review in determining substantial noncompliance by Father's failure to achieve desired outcomes rather than completion of required tasks.

We agree with the points made in Father's procedural argument for the reasons discussed at length in considering Mother's compliance. Without considering any "desired outcomes," our de novo review of the record nevertheless supports a finding of Father's substantial noncompliance with the responsibilities, tasks and/or actions required in the permanency plan.

While Father did comply with some requirements, he did not comply with the important

21

responsibility: "to show adequate parenting skills during visitation."[9]  It is important to note that this requirement is listed in the permanency plan under Section 7 "Visitation" as a responsibility - not a desired outcome.  At trial, Father's therapeutic visitation provider testified that Father was not able to understand the need to closely supervise these girls or how to set appropriate boundaries.  Father did not discipline, redirect or otherwise effectively parent the girls.  She cited as an example that Father repeatedly allowed youngest daughter V.R.T. to inappropriately touch him and sit in his lap despite counseling on the need for boundaries.

Also significant is Father's noncompliance with the actions required of Father concerning Outcome #7 which states that he "will be able to show/demonstrate age appropriate discipline and parenting skills." These actions required Father to cooperate with the therapeutic provider and follow the recommendations of the service provider.  The provider of Father's in-home counseling on the effects of sexual abuse on children testified about his attempts to advise Father regarding how to appropriately interact with his children.  Father, however, admitted to the provider that he was having difficulties and did not understand the effects of sexual abuse.  And when another attempted to provide counseling services to Father in April and May 2007, he refused to schedule time with her. The record here is replete with evidence that the father's attitude is inconsistent with the recognition that very special care and skill is needed to parent children who have been victims of sexual abuse.

While this Court does not determine Father's compliance by whether or not outcomes were achieved, this Court does appropriately determine Father's compliance by whether or not Father did the  "actions needed to achieve desired outcome[s]," as clearly stated in the permanency plan.  This Court finds that he did not complete these actions.  Therefore, by clear and convincing evidence this Court finds that Father did not substantially comply with the requirements of the permanency plan. The evidence does not preponderate against the trial court's finding, and we affirm this ground for termination of Father's parental rights.

**Other Issues Raised by Father**

Father raises two additional procedural issues.  First, Father argues that the juvenile court erred by admitting into evidence the most recent permanency plans even though they had not been ratified by the court.  As this Court has previously recognized, a trial court's failure to ratify permanency plans within the time required by Tenn. Code Ann. § 37-2-403 does not make such plans nullities. *In the Matter of A.W.*, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003). The provisions of Tenn. Code Ann. § 37-2-403 are directory rather than mandatory. *Id.*  Moreover, the responsibilities of Father had not materially changed on these permanency plans. Father testifies that he was aware of the requirements in the permanency plans. While he disagreed that he needed anger management classes, he agreed with the other requirements of the permanency plans.  Accordingly,

---

[9] This Court places great weight on this and other requirements concerning the safety and special needs of the two girls. *See In re Valentine*, 79 S.W.3d at 548 ("the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement").

the juvenile court did not err in admitting the January 25, 2007 permanency plan into evidence.

Second, Father asserts that the juvenile court erred in admitting the February 27, 2008, lengthy letter from a foster care counselor to counsel for DCS as a business record exception to the hearsay rule.

The totality of appellant's argument in support of this assertion is that "it is inconceivable that any judge could believe that [the letter]" was admissible. There was no citation to the Tennessee Rules of Evidence or case law. The issue is waived. Failure of a party to cite authority constitutes a waiver of the issue. *See* T.R.A.P. 27(a)(7); *Newcomb v. Kohler*, 222 S.W.3d 368, 400-401 (Tenn. Ct. App. 2006).

## C.    Best Interests of the Children

Tenn. Code Ann. § 36-1-113(i) sets out a list of factors for the court to consider in determining whether termination of parental rights would be in the best interest of the child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or contact with the child:
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household:
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is any criminal

activity in the home, or whether there is such use of alcohol or controllable substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The list is 'not exhaustive,'and there is no requirement that every factor must appear . . . ." *State v. P.M.T., et al.*, 2006 WL 2644373, at *9 (citations omitted). And the best interest of the child is to be determined from the perspective of the child rather than the parent. *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).These factors should be viewed from the perspective of the best interests of the children, a view which may be somewhat different than in determination of grounds for abandonment. As this Court recently reiterated in *In re D.P.M, S.H., and Y.M.*, 2008 Westlaw 4693725 WL 4693725, at *11 (Tenn. Ct. App. 2008) :

> Our courts have recognized that a determination of best interest is controlled by different considerations from a determination of grounds for termination. In the grounds inquiry, a parent's constitutional rights are given significant weight, and courts primarily look at the conduct of that parent . . . once grounds have been established, the best interests of the children become the paramount focus of the trial court.
> *(citing In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005).

The juvenile court below determined that it was in the best interests of the children to terminate both Mother's and Father's parental rights, as stated in the written order:

> [T]hey have not made changes in their conduct or circumstances that would make it safe for the children to go home . . . Mother continues to ask the girls to lie. Father has not been cooperative and has demonstrated some disturbing parenting behaviors . . . . [T]hey have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help . . . like financial assistance, parenting assistance, counseling services for 42 months [and] they still have not shown that they can appropriately parent these children.

**Father**

24

After reviewing the record, we agree with the juvenile court that a number of best interest factors weighed against Father and that termination of Father's parental rights is in the best interest of R.M.T. and V.F.T. Father had failed to make lasting adjustments in his conditions despite reasonable efforts from various providers. Father was provided with individual counseling and therapeutic visitation to assist him in understanding how to parent the children. Father testified that he understood that his daughters had special needs due to the sexual abuse. Yet, Father was not able to demonstrate that he understood the signs and effects of sexual abuse or how to parent sexually abused children.

Father's participation in counseling was sporadic. He displayed a lack of understanding and failure to make lasting adjustments to the children's needs during his supervised visits. He did not understand the need to closely supervise these girls or how to set appropriate boundaries. He had not maintained regular visitation and did not have a meaningful parental relationship with his children. *See* Tenn. Code Ann. § 36-1-113(i)(3) and (4). Although DCS attempted to accommodate Father's schedule, he would often be late or not show up for visitation. These girls did not appear to have a strong connection to Father.

For all these reasons, the juvenile court properly found that termination of Father's parental rights was in the best interests of the children R.M.T. and V.R.T. Accordingly, we affirm this finding and the termination of Father's parental rights.

## Mother

After reviewing the record, we agree with the juvenile court that a number of best interest factors also weighed against Mother, and termination of Mother's parental rights is in the best interests of B.D., R.M.T. and V.F.T. Mother has failed to make lasting adjustments in her conditions despite reasonable efforts from various providers. *See* Tenn. Code Ann. § 36-1-113(i)(1-2). Mother was provided with individual counseling and therapeutic visitation to assist her in understanding how to parent these children with special needs. Mother, however, was not able to demonstrate any understanding of the children's need for structure, boundaries and rules. Mother's inability to reach the desired outcomes of the permanency plan, while not used as a ground for termination, is appropriately considered in our determination of the best interests of the children.

Mother lacks a suitable and safe home. *See* Tenn. Code Ann. § 36-1-113(i)(7). Mother married an individual with whom she had a history of domestic disputes even though this could be potentially harmful to her children. Finally, at the time of the final day of the trial, Mother was homeless.

For all these reasons, the juvenile court also properly found that termination of Mother's parental rights was in the best interests of the children B.D., R.M.T. and V.R.T. Accordingly, we also affirm this finding and the termination of Mother's parental rights.

## CONCLUSION

For the reasons set forth above we affirm the judgment of the juvenile court terminating the parental rights of Father to children R.M.T. and V.F.T. Although we reverse two of the four grounds for termination of Mother's parental rights, we do furthermore affirm the judgment of the juvenile court terminating her rights to children B.D., R.M.T. and V.R.T.

Costs are assessed equally to Mother and Father, for which execution may issue if necessary.

_____

_____
SENIOR JUDGE WALTER C. KURTZ

26